**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEVADA**
**SOUTHERN DIVISION**

INOMEDIC/INNOVATIVE HEALTH )
APPLICATIONS, LLC, )
)
       **Petitioner** )
)
v. )    **Case No.** _____
)
NONINVASIVE MEDICAL )
TECHNOLOGIES, INC., )
)    2:14-ms-00044
       **Respondent.** )
_____)

## PETITION TO CONFIRM ARBITRATION AWARD

InoMedic/Innovative Health Applications, LLC (hereinafter "Petitioner" or "IHA")

submits this petition to confirm the final award in the amount of $159,138.06 of Arbitrator Jay

Young issued pursuant to the Commercial Rules of the American Arbitration Association on

June 2, 2014 in favor of Petitioner against NonInvasive Medical Technologies, Inc. (hereinafter

"Respondent" or "NMT").

    A.    <u>Jurisdiction</u>

    1.    This Court has jurisdiction over this petition pursuant to the authority of the

Federal Arbitration Act, 9 U.S.C. §§ 1 *et seq.*, and 28 U.S.C. § 1332(a).

    B.    <u>Parties</u>

    1.    Petitioner is a limited liability company organized under the laws of the

Commonwealth of Virginia with its principal place of business at 2 Eaton Street, Hampton, VA

23669.

3.     Respondent is a corporation organized under the laws of the State of Nevada with its principal place of business at 6412 S. Arville Street, Las Vegas, NV  89118.

C.    <u>Factual Background</u>

4.     IHA and NMT executed a subcontract agreement on November 18, 2011 under which IHA performed research and development work to determine the uniqueness of human cardiopulmonary signatures using NMT's Cardiopulmonary Signal Capture Device.  The subcontract, with a performance period of November 2011 through March 2013, was issued under NMT's prime contract with the Naval Surface Warfare Center-Crane Division (the "Government").  The subcontract provided that NMT would pay IHA for its services at stated monthly firm-fixed amounts.  The subcontract agreement is attached hereto as Exhibit A.

5.     Article 16 of the subcontract agreement provided that disputes would be resolved by binding and final arbitration in accordance with the Commercial Arbitration Rules of the American Arbitration Association, and the arbitration would take place in Clark County, Nevada.

6.     IHA performed from November 2011 until October 2, 2012 when it stopped work due to NMT's failure to pay IHA's invoices for services rendered in May, June and July 2012.

7.     Based on NMT's assurances to pay the outstanding amounts owed to IHA pursuant to an agreed payment schedule, IHA resumed work in mid-October 2012.  IHA provided written notice to NMT that IHA would again stop work for failure to pay any invoice dated October 15, 2012 and thereafter in accordance with the parties' subcontract agreement.

8.     IHA again stopped work on January 2, 2013 due to NMT's failure to pay for services rendered in October, November and December 2013.

9.     NMT completed its prime contract on or about March 31, 2013 and received full payment in the amount of $3,800,000.01 from the Government.

10.    IHA sent several written demands for payment to NMT, but IHA attempts to collect the monies owed were unsuccessful.

11.    On July 15, 2013, IHA filed its Demand for Arbitration with the American Arbitration Association seeking an award of the $150,000.00 owed by NMT, as well as interest, attorneys' fees and arbitration costs. *See* Exhibit B attached hereto. Pursuant to the agreement of the parties, Mr. Jay Young, an attorney practicing in Las Vegas, NV, was appointed as the arbitrator. *See* Exhibit C attached hereto.

12.    On August 28, 2013, NMT filed its Answering Statement and Counterclaim Request with the American Arbitration Association. NMT denied "the allegations and demands set forth in the Claimant Demand for Arbitration" and did not assert any counterclaims.

13.    NMT subsequently raised four affirmative defenses. The parties engaged in limited discovery and produced all documents deemed relevant to their respective claims.

14.    IHA filed a Motion for Summary Judgment on January 21, 2014. NMT filed its response in opposition to the Motion for Summary Judgment on February 10, 2014. IHA filed a reply on February 17, NMT filed a sur-reply on March 21, and IHA filed a response to the sur-reply on March 25. The parties fully briefed all issues, including NMT's affirmative defenses, in their filings.

15.    On April 15, 2014, Arbitrator Young issued a decision granting IHA's Motion for Summary Judgment and finding that IHA was entitled to its damages in the amount of $150,000.00, plus interest and arbitration costs. The decision denied IHA's request for an award of attorneys' fees. The decision reflects that the Arbitrator thoroughly considered all of the arguments and evidence presented by both parties in their briefs. *See* Exhibit D attached hereto.

16.    Upon consideration of IHA's request for interest, costs and expenses, and correction to an error in his Decision and Award, Arbitrator Young issued an Amended Decision and Award on June 2, 2014 declaring that IHA was awarded damages in the amount of $150,000.00, interest in the amount of $3,628.06, and fees/costs in the amount of $5,510.00, for a total award of $159,138.06.  *See* Exhibit E attached hereto.

17.    NMT has failed and refused to pay the award amount to IHA.

WHEREFORE, based on the foregoing and the accompanying Memorandum of Points and Authorities in Support of Petition to Confirm Arbitration Award, Petitioner respectfully requests that this Court enter judgment confirming the Arbitrator's final award decision dated June 2, 2014 pursuant to the Federal Arbitration Act, 9 U.S.C. § 9, in the amount of $159,138.06, and grant such other and further relief as the Court deems just and proper.

Respectfully submitted,

Thompson Coburn LLP

By _____

Katherine S. Nucci
D.C. Bar # 358539
1909 K Street, N.W., 6th Floor
Washington, D.C.  20006
Tel:  (202) 585-6931
Fax:  (202) 508-1016

Counsel to InoMedic/Innovative Health
Applications, LLC

Dated:  June 20, 2014

## CERTIFICATE OF SERVICE

I hereby certify that on this 20th day of June, 2014, I caused the foregoing Petition to Confirm Arbitration Award to be served via first-class mail upon Mark L. McAlpine, Esq., McAlpine PC, 3201 University Drive, Suite 100, Auburn Hills, MI 48326, counsel for Respondent NonInvasive Medical Technologies, Inc.

Katherine S. Nucci

# EXHIBIT A

SUBCONTRACT AGREEMENT

This Subcontract Agreement (hereinafter referred to as Subcontract) is entered into as of this 18 day of November, 2011 between Noninvasive Medical Technologies, INC., (NMT) with its principal place of business in 6412 S. Arville Street, Las Vegas, NV 89118 (hereinafter referred to as Contractor) and Innovative Health Applications, LLC, with its headquarters located at 2 Eaton Street, Suite 908, Hampton, VA 23669 (hereinafter referred to as, Subcontractor) and contractor upon the following terms and conditions:

## ARTICLE 1. SCOPE OF PROJECT, TASK ORDER REQUESTS AND RELATED MATTERS

1.1    Subcontractor shall conduct investigations/protocols as set forth in initially in Attachment A, Task Order BIO-001.

The terms and conditions of this Subcontract shall apply to any Task Order except as expressly modified therein. The specific requirements for investigations/protocols shall be set forth in Task Order(s) for that Clinical Trial. Each Task Order shall include all referenced schedules, exhibits, deliverables and attachments therein.

Any conflict between the Subcontract and/or associated Task Order and the Protocol; this Subcontract shall supersede in regards to contractual matters and the Protocol shall supersede in regards to medical care and scientific matters.

1.2    Subcontractor agrees to devote its best efforts to perform efficiently the work required hereunder and agrees to perform the Task Order (s) in conformance with the protocol and all applicable laws, rules and regulations relating to the conduct of the Task Order (s), particularly such laws, rules and regulations concerning or promulgated by the Food and Drug Administration.

1.3    Subcontractor shall provide Contractor with written evidence of review and approval of the protocol and the patient consent form by the applicable Subcontractor Review Board prior to the initiation of the Task Order and of the Subcontractor Review Board's continuing review and approval of the Task Order whenever it is reviewed, but at least once per year.

1.4    Subcontractor shall (i) prepare and maintain complete and accurate study documentation in compliance with applicable Federal, state and local laws, rules and regulations; and (ii) for each patient participating in the study, promptly prepare and submit to Contractor all original case report forms and such other reports as required by the protocol following completion or termination of the Task Order, or as otherwise required pursuant to the associated protocol.

1.5    Study documentation (including all case report forms, source documents and all clinical and other information generated as a result of the study) will be promptly and fully disclosed to Contractor by Subcontractor upon request or as set forth in the protocol, and also shall be made available at Subcontractor's site upon request for inspection, copying, review and audit in reasonable times by representatives of Contractor, the Food and Drug Administration or any other regulatory agencies. Subcontractor agrees to promptly advise Contractor of any regulatory inspection

relating to the study (of either the Subcontractor's site or of the Subcontractor Review Board) and to promptly provide Contractor with a copy of any inspection report. Subcontractor agrees to promptly take any reasonable steps that are requested by Contractor as a result of an audit to cure deficiencies in the study documentation and case report forms.

1.6     Subcontractor represents and warrants that Subcontractor is not and does not use in any capacity the services of any person debarred under subsections 306(A) or 306(B) of the Generic Drug Enforcement Act of 1992 (the Act) in connection with any of the services performed by Subcontractor under this Subcontract. Subcontractor covenants it will not use in any capacity the services of any person debarred under such subsections of the Act and will immediately disclose in writing to Contractor if any person who is performing services on this Subcontract hereunder is debarred or if any action, suit, claim, investigation or legal or administrative proceeding is pending or, to the best of Subcontractor's knowledge, threatened, relating to the debarment of Subcontractor or any person performing services hereunder.

## ARTICLE 2. CONTRACT TYPE AND PAYMENT TERMS

This is a fixed price level of effort (FPLOE) Contract with a maximum ceiling of $800,000. Payment terms and conditions will be addressed in Attachment A.

## ARTICLE 3. PRINCIPAL INVESTIGATOR

The Principal Investigator for this Subcontract shall be Kenneth D. Cohen, PhD, CCRP. Subcontractor agrees to promptly inform Contractor of any event or condition adversely affecting the satisfactory completion of - any clinical studies by the Principal Investigator. In the event the Principal Investigator shall be unable to complete this clinical study and Subcontractor and Contractor shall be unable to agree to a substitute investigator within a period of fifteen (15) days, this Subcontract shall be automatically terminated at the discretion of Contractor.

## ARTICLE 4. DATA RIGHTS AND PUBLICATION

It is the intent of the Contractor to present and publish data which results from this Subcontract Agreement. To this end, subcontractor will be coauthor on all publications or presentations which result from the work outlined in the SOW. In the case of subcontractor–initiated publications, the subcontractor will provide the publication to the Contractor for review a minimum of twenty (20) days prior to submission for publication. Contractor shall have said twenty (20) day period to respond to Subcontractor with any requested revisions. Subcontractor agrees to delete information identified by Contractor as confidential prior to submitting such manuscript and/or abstract for publication. If reasonably requested by Subcontractor, Contractor will take reasonable steps to expedite the review process to meet Subcontractor's publication deadlines. Upon notification by Contractor that such review has been completed, Subcontractor may submit the manuscript and/or abstract for publication after deleting information identified by Contractor as confidential. Contractor also has the right to publish the results of this study. Contractor shall own all intellectual property including hardware, software, source code, algorithms, data and case report forms resulting from study. Subcontractor will not file any patents pertaining to intellectual property resulting from study. Subcontractor may use data for research, educational and patient care purposes.

18 November 2011                                                2

## ARTICLE 5. CONFIDENTIALITY

5.1     To the extent permitted by Florida Law Subcontractor agrees not to disclose to any third party any information disclosed to it under this Subcontract or identified by Contractor confidential or classified.   Subcontractor may disclose information to staff members, employees or students necessary for the conduct of the study. This non-disclosure obligation shall not apply to:

    (i)     information that is in the public domain or subsequently enters the public domain through no fault of Subcontractor;

    (ii)    information that is presently known or becomes known to Subcontractor from its own independent sources from a person having the legal right to disclose information;

    (iii)   information that Subcontractor receives from any third party not under a confidential obligation to keep such information confidential; or

    (iv)   information that is required to be disclosed by law.

    (v)    Contractor shall not disclose confidential information unless it is necessary to the study.  Any confidential information will be clearly marked by Contractor, in writing, as "confidential" or if disclosed orally, written notice will be provided within 30 days of disclosures.

    (vi)   Subcontractor will protect Contractor's confidential information with the same degree of care as with Subcontractor's own confidential information.

    (vii)  If Subcontractor or any of its employees become aware of any disclosure not authorized hereunder, that party shall notify Contractor and take reasonable steps to prevent any further disclosure or unauthorized use.

If Subcontractor is required to disclose confidential information pursuant to Sections 5.1 (iv), the Subcontractor shall notify Contractor in writing, and the Subcontractor and Contractor shall agree to a mutually satisfactory way to disclose such information as necessary and in accordance with applicable law.

5.2     Subcontractor agrees to return to Contractor, upon request, all devices and equipment, samples, graphics, writings and information in other tangible forms, containing any confidential information provided by Contractor, and any copies of such confidential information, except for one archival copy to be retained by Subcontractor for purposes of observing compliance with this Subcontract.

5.3     No license, expressed or implied, to use the confidential information is granted to Subcontractor other than to use the confidential information in the manner and to the extent authorized by this Subcontract.

5.4    Notwithstanding anything to the contrary in Section 5.1, with respect to research subjects' medical records, the parties agree to hold in confidence the identity of the patients in accordance with all applicable Federal or local laws, rules and regulations, except to the extent necessary to be disclosed to regulatory agencies as part of the review process.

5.6    Subcontractor agrees to use Contractor provided study - devices and equipment, proprietary biological materials, and/or other study related materials that may be collected solely for the purposes of the study in accordance with the protocol unless agreed to otherwise in writing by Contractor.

## ARTICLE 6. INDEMNIFICATION

6.1    Contractor shall indemnify, defend and hold harmless Subcontractor, its trustees, officers, agents, employees and Principal Investigator, and any named co-investigator, from and against any demands, claims, actions, proceedings or costs of judgment that may be made or instituted against any of them by reason of personal injury (including death) to any person, or damage to property, arising out of or connected with the performance of the activities to be carried out pursuant to the protocol.

6.2    Notwithstanding the foregoing, the Contractor shall have no indemnification, obligation or liability for loss or damage resulting from:

(i)    failure of the Subcontractor or Principal Investigator to adhere to the terms and provisions of the Protocol or agreed amendments thereto or Contractor's written recommendations and instructions relative to the administration and use of any - devices, equipment or materials involved in this study;

(ii)    failure of Subcontractor or Principal Investigator to comply with any applicable FDA or other government or state requirements, law, rules or regulations applicable to the performance of its obligations under this study;

(iii)    failure of Subcontractor or Principal Investigator to render professional service or conduct the study in a normal, prudent manner;

(iv)    negligent acts or omission or willful misconduct by the Principal Investigator, Subcontractor, officers, agents or employees related to the performance of services under this Subcontract.

6.3    A condition of Contractor's indemnity obligation is that, whenever Principal Investigator and or Subcontractor has information from which it may reasonably conclude an incident of bodily injury or death has occurred, Subcontractor shall immediately give notice to Contractor of all pertinent data surrounding such incident..

6.4    In the event a claim is made or suit brought, Subcontractor and Principal Investigator shall assist

Contractor and cooperate in the gathering of information with respect to the time, place and circumstances of such claim or suit. Principal Investigator and Subcontractor agree to cooperate with Contractor in the defense of such claim or action.

6.5    Clinical trials will be performed at Subcontractor's facilities or in conjunction with other designated facilities, which certify that it maintains general liability protection coverage through the Florida Casualty Insurance Risk Management Trust Funds, established pursuant to section 284.40 Florida Statutes and administered by the State of Florida, Department of Insurance. Such protection is described in section 768.28, Florida Statutes.

6.6    Contractor will reimburse Subcontractor for reasonable and necessary costs for medical services incurred by Subcontractor's research subjects participating in this Study that are determined to be attributable to the use of the Contractor's study device  and not attributable to (1) the negligence, malpractice, or misconduct of Subcontractor or Subcontractor's Investigator or (2) product liability of a third party.

## ARTICLE 7. TERMINATION

7.1    Either party may terminate this Subcontract or the enrollment of patients into this study with thirty days written notice, except that any party may terminate this Subcontract immediately upon written notice to other parties if necessary to protect the health welfare or safety of any study subject. Such termination shall be effective upon receipt of the notice or as otherwise stated by the terminating party.

7.2    Upon termination of the study, Subcontractor shall deliver to Contractor within thirty (30) days from the receipt of the termination notice all completed case report forms.

7.3    Title to any and all equipment purchased at the expense of Contractor under this Subcontract shall belong to Contractor. Title to any and all equipment purchased at the expense of Subcontractor under this Subcontract shall belong to Subcontractor.

7.4    In the event of termination, the sum for professional services and expenses payable under

this Subcontract shall be limited to the pro-rated fees based on actual work performed and actual non-cancelable expenses committed pursuant to the protocol, except in the event of termination by Subcontractor for any reason not relating to patient safety, the sum for professional services and expenses payable under this Subcontract shall be limited to the pro-rated fees based on actual work performed. If, at the date of termination of the study, the total amount that Contractor has paid to Subcontractor exceeds the amount to which Subcontractor is entitled, Subcontractor shall return the difference to Contractor. If on the date of termination of the study the total amount that Contractor has paid Subcontractor is less than the amount to which Subcontractor is entitled, Subcontractor shall submit a statement to Contractor for the difference within sixty (60) days from the termination date. Payment shall be contingent upon the Contractor receiving all documentation required to be submitted by Subcontractor pursuant to Section 1.6. In no event

shall the amount owed under this Subcontract exceed the amount set forth in Section 2.1.

7.5    Termination of this Subcontract by either party shall not affect the rights and obligations of the parties accrued prior to the effective date of the termination. The rights and duties under Articles 1, 4, 5, 6, 7 and 8 survive the termination or expiration of this Subcontract.

## ARTICLE 8. PATENTS AND INVENTIONS

Patents and Inventions will be addressed in each individual Contractor-generated TASK ORDER.

## ARTICLE 9. ASSIGNMENT AND SUBCONTRACTING

Neither this Subcontract nor the rights or obligations hereunder shall be assignable or otherwise transferred or subcontracted by Subcontractor without Contractor's prior written consent.

## ARTICLE 10. INDEPENDENT CONTRACTOR

In undertaking to perform the Task Order(s) for Contractor, it is understood that Subcontractor is doing so as an independent contractor and not as an employee of Contractor.

## ARTICLE 11. GOVERNING LAW

This Subcontract shall be governed by and construed in accordance with the laws of the State of Nevada.

## ARTICLE 12. NOTICES

All notices or other communication which are required or permitted hereunder shall be in writing and sufficient if delivered personally, sent by prepaid air courier, sent by electronic delivery, mail or sent by telefax transmission, as addressed as follows:


Subcontractor:            Cynthia Gross
                          President
                          InoMedic/Innovative Health Applications, LLC
                          2 Eaton Street
                          Hampton, VA 23669


Principal Investigator:   Kenneth D. Cohen, PhD, CCRP
                          Innovative Health Applications, LLC
                          6141 N. Courtenay Pkwy, Suite A
                          Merritt Island, Florida
                          32953

Contractor:           Dr. Marc Ó Gríofa
                      Noninvasive Medical Technologies, Inc.
                      6412 S. Arville Street
                      Las Vegas, NV 89118

Any such communication shall be deemed to have been given when delivered if personally delivered, on the business day after dispatch if sent by air courier, on the third business day following the date of mailing if sent by mail and on the date of telefax if sent by telefax transmission.

## ARTICLE 13. USE OF NAME, LOGO, OR OTHER SYMBOLS

Neither party shall use the name, logo, or other symbols of the other party for any marketing or promotional purposes without prior written consent of the other party.

## ARTICLE 14. ENTIRE SUBCONTRACT

This Subcontract, along with any executed Task Orders, constitutes the entire Subcontract between the parties relating to the clinical study and supersedes all prior negotiations, representations, Subcontracts, and understandings among the parties with respect thereto.

## ARTICLE 15. AMENDMENT, MODIFICATION AND WAIVER

This Subcontract shall not be altered or otherwise amended except pursuant to an instrument in writing signed by each of the parties hereto, except that any party to this Subcontract may waive any obligation owed to it by another party under this Subcontract in writing. The waiver by any party hereto of a breach of any provision of this Subcontract shall not operate or be construed as a waiver of any subsequent breach.

## ARTICLE 16. DISPUTES

Contractor and Subcontractor agree to first enter into negotiations to resolve any controversy, claim or dispute ("dispute") arising under or relating to this Subcontract. The parties agree to negotiate in good faith to reach a mutually agreeable resolution of such dispute within a reasonable period of time. If good faith negotiations are unsuccessful, Contractor and Subcontractor agree to resolve the dispute by binding and final arbitration in accordance with the Commercial Arbitration Rules of the American Arbitration Association then in effect. The arbitration shall take place in the Clark County, State of Nevada. The arbitrator(s) shall be bound to follow the provisions of this Subcontract in resolving the dispute, and may not award punitive damages. The decision of the arbitrator(s) shall be final and binding on the parties, and any award of the arbitrator(s) may be entered or enforced in any court of competent jurisdiction.

## ARTICLE 17. CLAUSES INCORPORATED BY REFERENCE

This Agreement incorporates the following Clauses found in the Contractor's Prime Contract, with the same force and effect as if they were given in full text.  Whenever appropriate, references to the "Government" or "Contracting Officer" shall mean "Noninvasive Medical Technologies, INC.," and references to "Contractor" shall mean "Innovative Health Applications, LLC"

| | | |
|---|---|---|
| 52.202-1 | Definitions | JUL 2004 |
| 52.203-3 | Gratuities | APR 1984 |
| 52.203-5 | Covenant Against Contingent Fees | APR 1984 |
| 52.203-6 | Restrictions On Subcontractor Sales To The Government | SEP 2006 |
| 52.203-7 | Anti-Kickback Procedures | OCT 2010 |
| 52.203-8 | Cancellation, Rescission, and Recovery of Funds for Illegal or Improper Activity | JAN 1997 |
| 52.203-10 | Price Or Fee Adjustment For Illegal Or Improper Activity | JAN 1997 |
| 52.203-12 | Limitation On Payments To Influence Certain Federal Transactions | OCT 2010 |
| 52.204-4 | Printed or Copied Double-Sided on Postconsumer Fiber Content Paper | MAY 2011 |
| 52.204-7 | Central Contractor Registration | APR 2008 |
| 52.204-10 | Reporting Executive Compensation and First-Tier Subcontract Awards | JUL 2010 |
| 52.209-6 | Protecting the Government's Interest When Subcontracting With Contractors Debarred, Suspended, or Proposed for Debarment | DEC 2010 |
| 52.209-10 | Prohibition on Contracting With Inverted Domestic Corporations | MAY 2011 |
| 52.211-15 | Defense Priority And Allocation Requirements | APR 2008 |
| 52.215-8 | Order of Precedence--Uniform Contract Format | OCT 1997 |
| 52.215-10 | Price Reduction for Defective Certified Cost or Pricing Data | AUG 2011 |
| 52.215-12 | Subcontractor Certified Cost or Pricing Data | OCT 2010 |
| 52.215-15 | Pension Adjustments and Asset Reversions | OCT 2010 |
| 52.215-16 | Facilities Capital Cost of Money | JUN 2003 |
| 52.215-17 | Waiver of Facilities Capital Cost of Money | OCT 1997 |

| | | |
|---|---|---|
| 52.215-18 | Reversion or Adjustment of Plans for Postretirement Benefits (PRB) Other than Pensions | JUL 2005 |
| 52.215-19 | Notification of Ownership Changes | OCT 1997 |
| 52.215-21 | Requirements for Certified Cost or Pricing Data or Information Other Than Certified Cost or Pricing Data--Modifications | OCT 2010 |
| 52.219-8 | Utilization of Small Business Concerns | JAN 2011 |
| 52.222-3 | Convict Labor | JUN 2003 |
| 52.222-19 | Child Labor -- Cooperation with Authorities and Remedies | JUL 2010 |
| 52.222-21 | Prohibition Of Segregated Facilities | FEB 1999 |
| 52.222-26 | Equal Opportunity | MAR 2007 |
| 52.222-35 | Equal Opportunity for Veterans | SEP 2010 |
| 52.222-36 | Affirmative Action For Workers With Disabilities | OCT 2010 |
| 52.222-37 | Employment Reports on Veterans | SEP 2010 |
| 52.222-50 | Combating Trafficking in Persons | FEB 2009 |
| 52.222-54 | Employment Eligibility Verification | JAN 2009 |
| 52.223-6 | Drug-Free Workplace | MAY 2001 |
| 52.223-18 | Encouraging Contractor Policies To Ban Text Messaging While Driving | AUG 2011 |
| 52.224-1 | Privacy Act Notification | APR 1984 |
| 52.224-2 | Privacy Act | APR 1984 |
| 52.225-13 | Restrictions on Certain Foreign Purchases | JUN 2008 |
| 52.227-1 Alt I | Authorization And Consent (Dec 2007) - Alternate I | APR 1984 |
| 52.227-2 | Notice And Assistance Regarding Patent And Copyright Infringement | DEC 2007 |
| 52.227-11 | Patent Rights--Ownership By The Contractor | DEC 2007 |
| 52.227-14 | Rights in Data--General | DEC 2007 |
| 52.227-16 | Additional Data Requirements | JUN 1987 |

| | | |
|---|---|---|
| 52.227-23 | Rights to Proposal Data (Technical) | JUN 1987 |
| 52.229-4 | Federal, State, And Local Taxes (State and Local Adjustments) | APR 2003 |
| 52.232-2 | Payments Under Fixed-Price Research And Development Contracts | APR 1984 |
| 52.232-8 | Discounts For Prompt Payment | FEB 2002 |
| 52.232-11 | Extras | APR 1984 |
| 52.232-17 | Interest | OCT 2010 |
| 52.232-23 | Assignment Of Claims | JAN 1986 |
| 52.232-25 | Prompt Payment | OCT 2008 |
| 52.232-32 | Performance-Based Payments | AUG 2010 |
| 52.232-33 | Payment by Electronic Funds Transfer--Central Contractor Registration | OCT 2003 |
| 52.233-1 | Disputes | JUL 2002 |
| 52.233-3 | Protest After Award | AUG 1996 |
| 52.233-4 | Applicable Law for Breach of Contract Claim | OCT 2004 |
| 52.242-13 | Bankruptcy | JUL 1995 |
| 52.243-1 Alt II | Changes—Fixed-Price (Aug 1987) - Alternate II | APR 1984 |
| 52.244-2 | Subcontracts | OCT 2010 |
| 52.244-5 | Competition In Subcontracting | DEC 1996 |
| 52.244-6 | Subcontracts for Commercial Items | DEC 2010 |
| 52.246-23 | Limitation Of Liability | FEB 1997 |
| 52.246-25 | Limitation Of Liability--Services | FEB 1997 |
| 52.249-4 | Termination For Convenience Of The Government (Services) (Short Form) | APR 1984 |
| 52.249-9 | Default (Fixed-Priced Research And Development) | APR 1984 |
| 52.253-1 | Computer Generated Forms | JAN 1991 |
| 252.203-7000 | Requirements Relating to Compensation of Former DoD Officials | JAN 2009 |

| | | |
|---|---|---|
| 252.203-7001 | Prohibition On Persons Convicted of Fraud or Other Defense-Contract-Related Felonies | DEC 2008 |
| 252.203-7002 | Requirement to Inform Employees of Whistleblower Rights | JAN 2009 |
| 252.204-7000 | Disclosure Of Information | DEC 1991 |
| 252.204-7003 | Control Of Government Personnel Work Product | APR 1992 |
| 252.204-7008 | Export-Controlled Items | APR 2010 |
| 252.205-7000 | Provision Of Information To Cooperative Agreement Holders | DEC 1991 |
| 252.209-7001 | Disclosure of Ownership or Control by the Government of a Terrorist Country | JAN 2009 |
| 252.209-7004 | Subcontracting With Firms That Are Owned or Controlled By The Government of a Terrorist Country | DEC 2006 |
| 252.215-7000 | Pricing Adjustments | DEC 1991 |
| 252.215-7002 | Cost Estimating System Requirements | MAY 2011 |
| 252.223-7004 | Drug Free Work Force | SEP 1988 |
| 252.225-7006 | Quarterly Reporting of Actual Contract Performance Outside the United States | OCT 2010 |
| 252.225-7012 | Preference For Certain Domestic Commodities | JUN 2010 |
| 252.225-7031 | Secondary Arab Boycott Of Israel | JUN 2005 |
| 252.226-7001 | Utilization of Indian Organizations and Indian-Owned Economic Enterprises, and Native Hawaiian Small Business Concerns | SEP 2004 |
| 252.227-7013 | Rights in Technical Data--Noncommercial Items | MAR 2011 |
| 252.227-7014 | Rights in Noncommercial Computer Software and Noncommercial Computer Software Documentation | MAR 2011 |
| 252.227-7017 | Identification and Assertion of Use, Release, or Disclosure Restrictions | JAN 2011 |
| 252.227-7025 | Limitations on the Use or Disclosure of Government-Furnished Information Marked with Restrictive Legends | MAR 2011 |
| 252.227-7026 | Deferred Delivery Of Technical Data Or Computer Software | APR 1988 |

| | | |
|---|---|---|
| 252.227-7027 | Deferred Ordering Of Technical Data Or Computer Software | APR 1988 |
| 252.227-7028 | Technical Data or Computer Software Previously Delivered to the Government | JUN 1995 |
| 252.227-7030 | Technical Data--Withholding Of Payment | MAR 2000 |
| 252.227-7039 | Patents--Reporting Of Subject Inventions | APR 1990 |
| 252.231-7000 | Supplemental Cost Principles | DEC 1991 |
| 252.232-7010 | Levies on Contract Payments | DEC 2006 |
| 252.235-7004 | Protection of Human Subjects | JUL 2009 |
| 252.235-7010 | Acknowledgment of Support and Disclaimer | MAY 1995 |
| 252.235-7011 | Final Scientific or Technical Report | NOV 2004 |
| 252.243-7001 | Pricing Of Contract Modifications | DEC 1991 |
| 252.243-7002 | Requests for Equitable Adjustment | MAR 1998 |
| 252.247-7023 | Transportation of Supplies by Sea | MAY 2002 |

IN WITNESS WHEREOF, the parties have caused this Subcontract to be duly executed by an appropriate officer as of the day and year first above written.

NONINVASIVE MEDICAL TECHNOLOGIES

By: _____

Name: Dr. Marc Ó Gríofa

Title: CTO/CMO

Date: 11 - 18 - 11

INNOVATIVE HEALTH APPLICATIONS

By: _____

Name: Cynthia L. Gross

Title: President

Date: 11-18-11

READ AND ACKNOWLEDGED BY PRINCIPAL INVESTOGATOR

Name: Kenneth D. Cohen, PhD, CCRP

Title:

Date:

18 November 2011                    13

ATTACHMENT A

**NMT – IHA Task Order BIO-001**

This document provides a broad outline of the requirements, objectives, milestones and deliverables for the biometrics contract that will be required of IHA (Subcontractor) by NMT (Contractor). This work effort will take place between November 2011 and March 2013.

**STATEMENT OF WORK**

1.0    SCOPE.  This SOW is for the research and development effort to determine uniqueness of human cardiopulmonary signatures, for implementation into a biometric system that will collect, store, and compare the data in order to accurately identify an isolated or remote person.  This SOW defines the engineering, technical and managerial support services to develop, test, demonstrate, characterize, and deliver the biometric system that provides identification of human subjects.

2.0    APPLICABLE DOCUMENTS.   Any Military handbooks, Government instructions, service regulations, if required or used during the course of this contract by the Subcontractor, shall be included and clearly referenced. All deliverables and documentation should refer to the appropriate CDRL and DID as provided by the Contractor.

3.0    REQUIREMENTS.

3.1    Cardiopulmonary Signal Capture Device

The Contractor will provide the V1.0 of this technology with additional engineering support for subject matter expertise. The Subcontractor will develop the hardware and software requirements of the V2.1 (Triage) and V2.2 (Biometrics) cardiopulmonary signal capture device in consultation with the Contractor. It is anticipated that both of these devices will be almost identical in hardware specification.

3.1.1    The Subcontractor shall design and construct a portable cardiopulmonary signal capture device. The final design shall incorporate performance modifications to the current Radio Frequency Impedance

18 November 2011                                    14

Interrogation (RFII) technology. This portable cardiopulmonary RFII signal capture device will be capable of triaging multiple individuals in a pre-hospital operational environment based on standard triage categories (Green, Yellow, Red) utilizing RFII and SpO2 monitoring capability. **[Deliverable – Cardiopulmonary signal capture device (Triage)]**

3.1.2    The Subcontractor shall design and construct a new sensor with the capability to detect, analyze, store, and transmit sufficient cardiopulmonary waveform data in real-time to uniquely identify individuals from a database of template cardiopulmonary signatures within acceptable FAR (False Acceptance Rate) and FRR (False Rejection Rate) parameters. **[Deliverable – Cardiopulmonary signal capture device (Biometrics)]**

3.2    Biometric Data Collection

3.2.1    The Subcontractor shall develop all necessary study documentation, and obtain approval/authorization to test, collect, and store data on human subjects.  This includes, but is not limited to, human safety and personal information. A human research protection documentation and requirements checklist will be provided by the Contractor. **[Deliverable – Human research study and protection approval documentation]**

3.2.2    The Subcontractor shall enroll 100-200 individuals to provide cardiopulmonary signatures (testing will be completed on small groups of individuals (not fewer than 25 per study)). Baseline data shall be collected on all subjects.  Additional data collection shall be completed to support the studies listed in paragraphs under section 3.2.3.  Data shall then be analyzed for biometric correlation.  The Subcontractor shall inform the contractor a minimum of 7 days before the cardiopulmonary database data collection events.  A Contractor/Government observer may be present during testing. **[Deliverable – Human research studies 1-6]**

3.2.3    The Subcontractor shall perform multiple research studies to assess the influence of the following factors, and how they affect the biometric validity of the cardio synchronous signal for personnel identification.  The studies shall collect and analyze additional data on 25 or more individuals. These studies shall assess the hemodynamic changes due to the variables below, and their effects on the system's FAR and FRR for the identification and authentication functions, and for Study 6, the non-survivor function.

18 November 2011                                        15

3.2.3.1  Study 1 - Positional changes (Supine vs. Standing)

3.2.3.2  Study 2 - Environmental changes (including extreme temperatures)

3.2.3.3  Study 3 - Physical changes (healthy vs. injured, using Lower Body Negative Pressure (LBNP) assessment to simulate hemorrhage/injury)

3.2.3.4  Study 4 - Physiological changes (including, anxiety/duress, calm/chaotic, fatigue, confined)

3.2.3.5  Study 5 - Other assessments on factors determined to be significant in their effect on the cardiopulmonary signatures (including, gender, race, age, prescription effects, pre-existing medical conditions, disease complications, etc.)

3.2.3.6  Study 6 – Identification of non-survivors – Collect and analyze data to characterize the system's ability to distinguish when the RFII sensor is placed on a live human,  or a non-survivor-.  This may include data collection and/or analysis of RFII data from medical cadavers and/or animals.

3.3      The Subcontractor shall provide the necessary technical support to a Contractor-designated biometric specialist group to help develop the initial database with necessary features for the RFII cardiopulmonary signatures templates.  This database will be used for the storage of cardiopulmonary signature data captured during the research studies in Task 3.2. (** Database is not a required deliverable from Subcontractor)

3.4      The Subcontractor shall provide the necessary technical support to a Contractor-designated biometric specialist group to help develop software algorithm(s) (Matching Module) to compare select captured cardiopulmonary signatures against the database template elements to support accurate identification, authentication, and non-survivor functions.  (**Software source code and software algorithm description document for Matching Module are not a required deliverable from Subcontractor)

3.4.1   The Subcontractor shall provide the necessary technical support to a Contractor-designated biometric specialist group to help analysis of the ability of RFII to accurately and repeatedly capture cardiopulmonary signature and assess the signature variability under static conditions.   The Subcontractor shall help identify contributing factors of error in the data collected.

3.4.2   The Subcontractor shall provide the necessary technical support to a Contractor-designated biometric specialist group to help build statistical models to characterize key features of the cardiopulmonary signatures acquired by RFII in varying positional, environmental, physical, physiological, and other conditions referenced in Section 3.2 above.

3.4.3   The Subcontractor shall provide the necessary technical support to a Contractor-designated biometric specialist group to help analyze and characterize inter-personal cardiopulmonary signature variability (e.g. the Subcontractor shall help perform analysis of potential cardiopulmonary waveform signature differences among the test population).

3.4.4   The Subcontractor shall provide the necessary technical support to a Contractor-designated biometric specialist group to help analyze and characterize intra-personal cardiopulmonary signature variability (e.g. the Subcontractor shall help perform analysis of signature differences within the same individual under varying positional, environmental, physical, physiological, and other conditions referenced in Section 3.2 above).

3.5     The Subcontractor shall provide the necessary technical support to a Contractor-designated biometric specialist group to help provide adaptations to the RFII technology and signal processing software to enhance discriminating feature extraction and matching capabilities.

3.5.1   The Subcontractor shall provide the necessary technical support to a Contractor-designated biometric specialist group to help analyze different feature extraction methods for enhancing discriminative features that provide good biometric identifiers.

3.5.2   The Subcontractor shall provide the necessary technical support to a Contractor-designated biometric specialist group to help analyze different pattern recognition methods for finding landmarks and features that provide good biometric identifiers.

3.5.3     The Subcontractor shall provide the necessary technical support to a Contractor-designated biometric specialist group to help analyze signal conditioning and pre-processing for enhancing performance of paragraph 3.4.2.

3.5.4     The Subcontractor shall provide the necessary technical support to a Contractor-designated biometric specialist group to help perform invariant feature analysis to identify invariant features (i.e. features that do not change) across cardiopulmonary signatures that may vary due to position, physical exertion, health status, etc.

3.5.5     The Subcontractor shall provide the necessary technical support to a Contractor-designated biometric specialist group to help examine statistical models and discriminate classifiers for performing biometric identification.

3.5.6     The Subcontractor shall perform an analysis to determine the system's ability to detect the presence of a non-survivor.  The Subcontractor shall perform an analysis of the system's ability to distinguish when the RFII sensor is placed on a live human- or non-survivor- (See research study 3.2.3.6).

3.5.7     The Subcontractor shall provide the necessary technical support to a Contractor-designated biometric specialist group to help develop a preliminary cardiopulmonary signature recognition algorithm(s) based on the above tasks.  The Subcontractor shall provide the necessary technical support to a designated biometric specialist group to use the preliminary algorithms to perform personnel identification in order to compute identification success rates and curves on various datasets to generate systems performance benchmark(s).  The Subcontractor shall provide the necessary technical support to a designated biometric specialist group to further develop and refine the preliminary algorithms with the objective to improve the system's ability to identify and differentiate one individual from another with at least a 95% probability of correctness.

3.6     Using the results and algorithms of previous sections, the Subcontractor shall, in conjunction with the Contractor-designated biometrics specialist group, develop, test, and deliver an operational system for use in an office/– laboratory environment.  This includes but is not limited to - hardware, computers, sensors, and software that will enable the Contractor to demonstrate the system, - including identification, authentication, and non-survivor functions, and adding new database entries. [Deliverable – Demonstrator System]

3.6.1    It is an objective of this R&D effort to minimize the FAR and FRR.  It is an objective for the Demonstrator System to provide identity matches for signatures with at least a 95% probability of correctness.

3.6.2    The Subcontractor shall provide the necessary technical support to a Contractor-designated biometric specialist group to help perform an analysis or comparison of the demonstrated performance of the Demonstrator System compared to the performance of other existing/currently used biometric identification systems (fingerprint / iris scan / facial / voice).  This shall include a comparison of the probability of correctly identifying an individual from a database of population templates.

3.6.3    The Demonstrator System shall provide feature extraction of the cardiopulmonary signature and perform a personnel identification function (identifies one individual from a database of many), an authentication function (verifies an individual matches a particular database template), a non-survivor function (determines if the RFII is on a live human or non-survivor), and/or a database entry function (adds an individual's cardiopulmonary signature data to the database of templates for future comparisons).

3.6.4    The Demonstrator System shall have the capability to filter the database based upon known parameters to reduce the processing time required for feature matching (Identification and Authentication) (for example, not running the matching algorithm on the male templates when the test subject is a female).

3.7      The Subcontractor shall provide the necessary technical support to a Contractor-designated biometric specialist group and military operations specialist to help test, characterize, and provide the following performance parameters of the Demonstrator System, as well as values anticipated/projected for the proposed military application/system after further development is performed:  **[Deliverable – Performance parameters of cardiopulmonary signal capture device]**

3.7.1    Data capture time to acquire the cardiopulmonary signature from an individual for the Identification, Authentication, and non-survivor functions.

3.7.2    Time and process required for Contractor-designated biometric specialist group to build up a database template entry for an individual.

3.7.3    Processing time to match features with a database template with an acceptance rate of 95% or greater for positive identification

3.7.4    Data transmission method and rate will be based upon the size  - of data transmission (in kilobytes or megabytes) required from the RFII to the computer running the matching software. -This will help determine feasibility, time, and range of transmission over communication networks.

3.7.5    Metrics that characterize the uniqueness of the cardiopulmonary signature of an individual and its ability to provide correct personnel identification.  Metrics that characterize the probability of correct identification, authentication, and non-survivor functions.

3.7.6    Range and method of transmission from the RFII device to the database computer.

3.7.7    Power requirements and power management features used in the RFII device.

3.7.8    Duration of operational power for the RFII device.

3.7.9    Storage and memory onboard the RFII device, and storage and memory requirements for the database.

3.7.10   Security features of the RFII device.

3.7.11   Training and  Maintenance

3.8    System Demonstration.  The Subcontractor shall conduct a demonstration in accordance with a Subcontractor developed (and Contractor/Government approved) plan.  The purpose is to allow the Contractor/Government representatives to observe the system capabilities.  The demonstration will be held at a Subcontractor/Contractor facility.  For estimation purposes, the demonstration will last - one

day.  The Subcontractor shall conduct an internal Test Readiness Review (TRR) 30 days prior to the System Demonstration.  Additional details will be provided for guidance on content and execution of the TRR.  [Deliverable – System Demonstration]

3.9    Final Report.  The Subcontractor shall prepare and provide a draft of the Final Technology Development Report 45 days before contract completion for the Contractor review and approval process.  The final report shall be a comprehensive report of all work conducted under the contract, including detailed analysis, design work, software descriptions, laboratory and test results, technology and system limitations, and overall research results and conclusions.  Contractor will provide input on final format.  The final test report shall be submitted not later than 10 days after receipt of Contractors comments.  The Subcontractor shall submit the final report suitable for publication and release to the Contractor.  The report shall be unclassified. [Deliverable – Final Report]

3.10    The Subcontractor shall provide a detailed program plan and schedule. The program plan and schedule will refer to and follow the appropriate CDRL and DID.  [Deliverable – Program Plan and Schedule]

3.11    Safety Assessment Report.  The system shall be free of safety hazards to users and maintenance personnel.  The Subcontractor shall prepare a Safety Assessment Report (SAR).  Subcontractor format is acceptable.   The SAR shall address all known safety aspects concerning the demonstration items, installation, operation, and disposal.  The SAR shall be provided 80 days prior to demonstration of the system. [Deliverable – Safety Assessment Report]

3.12    Training.  The Subcontractor shall provide a system operation guide.  The guide shall include sufficient details to enable the Contractor to demonstrate the system, including identification, authentication, and non-survivor functions, and adding new database entries.  [Deliverable – System Operation Guide]

3.13    Contractor Oversight.  The Contractor retains the right to observe Subcontractor testing.  The Subcontractor shall inform the Contractor a minimum of 7 days before the cardiopulmonary database data collection events.  A Contractor/– Government observer may be present during Subcontractor testing.

3.14    Data Collection.  The Subcontractor shall collect and document and deliver all test data to Contractor-designated biometrics specialists group who shall develop and maintain database system for all test data.

3.15    Repairs/Replacements.  The Subcontractor shall provide for and replace or repair any failed prototype or test item during the length of the contract.

3.16    Demonstration System.  Prototypes, spares, repair parts and specifically designed test items developed/purchased under this contract will become Contractor property upon acceptance by authorized Contractor personnel.

3.17    Shipment.  The Subcontractor shall ship the Demonstrator System and support items to a designated Contractor activity.

3.18    Contractor Acceptance Test.  Upon Demonstrator System arrival at the Contractor facility, the Subcontractor shall support a Contractor/Government acceptance test in accordance with a Subcontractor developed (and Contractor/Government approved) test plan and procedures.  The test plan and procedures may be the same as the demonstration performed at the Subcontractor/Contractor facility. At a minimum, the acceptance test procedures shall include system setup procedures, power up procedures, and procedures for verification of the identification, authentication, non-survivor, and database enrollment functions.  The Contractor will accept the delivery upon successful completion of the acceptance test.

3.19    Meetings and Reviews.  The Subcontractor shall support the following meetings and reviews. All meeting materials and reviews must adhere to the appropriate CDRL and DID.

3.19.1  Technical interchange meetings with the contractor shall be conducted in person at the Subcontractor/Contractor/Government facility, via teleconference and/or e-mail as necessary.

3.20    Biweekly, Monthly Status Progress & Management Reports.  The Subcontractor shall prepare and deliver biweekly and monthly reports in Contractor approved format based on Contractor designated timelines.  The Monthly reports shall be delivered to the designated Contractor POC within 5

days of the end of the calendar month.  These monthly reports shall describe the technical progress, schedule and prevalent program and risk issues during the reporting period. The reports will refer to and follow the appropriate CDRL and DID. **[Deliverable – Biweekly, Monthly, Management reports]**

3.20.1  The Subcontractor shall also provide a comprehensive and detailed quarterly report describing all technical progress, schedule and prevalent program and risk issues during the reporting period that is suitable for dissemination to designated Contractor/Government officials. The Subcontractor shall also provide detailed presentation material suitable for dissemination to designated Contractor/Government officials. The Quarterly reports and presentation materials shall be delivered to the designated Contractor POC 10 days prior to the designated quarter technical interchange review (Dates will be provided by Contractor). **[Deliverable – Quarterly report and presentation material]**

3.21    Test Plan.  The Subcontractor shall develop a detailed comprehensive test plan to test all aspects of the system. The test plan will refer to and follow the appropriate CDRL and DID. **[Deliverable – Test Plan]**

4.0     CONTRACTOR FURNISHED MATERIAL (CFM). The Subcontractor shall identify any required CFM that will need to be provided.

5.0     SUBCONTRACTOR DELIVERABLES.  The Subcontractor shall provide all required deliverables to the following address: TBD. Electronic "soft" copies shall be provided.

5.1     Cardiopulmonary Signal Capture Device (V2.1, V2.2)

5.2     Human Subject Testing Application and Approval Documentation

5.3     Research Studies

5.4     Reports (Biweekly, monthly, management)

5.5        Demonstrator System

5.6        Performance Parameters

5.7        System Demonstration

5.8        Final Report

5.9        Program Plan and Schedule

5.10       Safety Assessment Report

5.11       System Operation Guide

5.12       Electronic Copies of Quarterly Report and Presentation Materials (one set per Quarter)

5.13       Test Plan

6.0        PLACE OF PERFORMANCE.  All work shall be performed at the Subcontractors' facilities unless otherwise indicated.

7.0        PERIOD OF PERFORMANCE.  The period of performance for the contract is 18 months (Starting November 2011).

8.0        DATA PUBLICATION.  Any publications which result from this SOW will credit the Subcontractor as co-author.

18 November 2011                          24

9.0    BILLING SCHEDULE

Payment will occur after 30 days once submitted by the Subcontractor and approved by the Contractor/Government.

| Event | Event Description | Month | Closure Criteria | Severable or Cumulative | Event Amount | Total |
|-------|------------------|-------|------------------|------------------------|--------------|-------|
| 1 | Bi-weekly      /  Monthly Report | Nov '11 | Government will approve | C | $45,000 | $45,000 |
| 2 | Bi-weekly      /  Monthly Report | Dec '11 | Government will approve | C | $45,000 | $90,000.00 |
| 3 | Bi-weekly      /  Monthly Report | Jan '12 | Government will approve | C | $45,000 | $135,000.00 |
| 4 | Bi-weekly      /  Monthly Report | Feb '12 | Government will approve | C | $45,000 | $180,000.00 |
| 5 | Bi-weekly      /  Monthly Report | Mar '12 | Government will approve | C | $45,000 | $225,000.00 |
| 6 | Bi-weekly      /  Monthly Report | Apr '12 | Government will approve | C | $45,000 | $270,000.00 |
| 7 | Bi-weekly      /  Monthly Report | May '12 | Government will approve | C | $45,000 | $315,000.00 |
| 8 | Bi-weekly Monthly | Jun | Government | C | $45,000 | $360,000.00 |

| | Report | '12 | will approve | | | |
|---|---|---|---|---|---|---|
| 9 | Bi-weekly / Monthly Report | Jul '12 | Government will approve | C | $45,000 | $405,000.00 |
| 10 | Bi-weekly / Monthly Report | Aug '12 | Government will approve | C | $45,000 | $450,000.00 |
| 11 | Bi-weekly / Monthly Report | Sep '12 | Government will approve | C | $45,000 | $495,000.00 |
| 12 | Bi-weekly / Monthly Report | Oct '12 | Government will approve | C | $45,000 | $540,000.00 |
| 13 | Bi-weekly / Monthly Report | Nov '12 | Government will approve | C | $45,000 | $585,000.00 |
| 14 | Bi-weekly / Monthly Report | Dec '12 | Government will approve | C | $45,000 | $630,000.00 |
| 15 | Bi-weekly / Monthly Report | Jan '13 | Government will approve | C | $45,000 | $675,000.00 |
| 16 | Bi-weekly / Monthly Report | Feb '13 | Government will approve | C | $45,000 | $720,000.00 |
| 17 | Final Report / Demonstration | Mar '13 | Government will approve | C | $80,000.00 | $800,000.00 |

18 November 2011                                   26

IN WITNESS WHEREOF, the parties have caused this Agreement to be duly executed by an appropriate officer as of the day and year written below.

NONINVASIVE MEDICAL TECHNOLOGIES

By: _____

Name: Dr. Marc Ó Gríofa

Title: CTO/CMO

Date: 11 - 18 - 11

INNOVATIVE HEALTH APPLICATIONS

By: _____

Name: Cynthia L. Gross

Title: President

Date: 11 - 18 - 11

READ AND ACKNOWLEDGED BY PRINCIPAL INVESTIGATOR

Name: Kenneth D. Cohen, PhD, CCRP

Title: Principal Investigator

Date: 21 Nov 2011

18 November 2011                                        27

**EXHIBIT B**



Katherine S. Nucci
P 202.585.6931
F 202.508.1016
knucci@thompsoncoburn.com

July 12, 2013

**VIA FEDERAL EXPRESS**

American Arbitration Association
Case Filing Services
1101 Laurel Oak Road, Suite 100
Voorhees, NJ  08043

Re:    <u>Demand for Arbitration</u>

Dear Sir or Madam:

On behalf of Claimant InoMedic/Innovative Health Applications, LLC, we enclose a Demand for Arbitration against Respondent Noninvasive Medical Technologies, Inc.  Attached to the Demand are the first page, page 7 including the Disputes clause, and the signature page of the subcontract agreement between the Claimant and Respondent under which this Demand is being made.  We also enclose the required filing fee in the amount of $1,850.00.

Please direct all communications regarding this matter to the attention of the undersigned.

Very truly yours,

Thompson Coburn LLP

By    *Katherine S Nucci*
      Katherine S. Nucci
      Counsel to InoMedic/Innovative Health Applications, LLC

Enclosures

cc: Mr. Ron McCaughan
    Ms. Cynthia L. Gross

This check is printed with a specially designed security background.

**THOMPSON COBURN LLP**
*Attorneys at Law*

1909 K Street, N.W.
Suite 600
Washington, D.C. 20006-1167

Branch Banking and Trust Company
Washington, DC 20006

15-154
540

1484

Date: July 12, 2013

Pay: One thousand eight hundred fifty and 00/100

$ **1,850.00**

PAY
TO THE
ORDER OF:   American Arbitration Association, Inc.

Void After 90 Days

Checks in excess of $1500 void without two signatures

THOMPSON COBURN LLP

⑆00 1484⑆   ⑆054001547⑆   51626981 19⑆

| Payee: | American Arbitration Association, Inc. | Check #: | 1484 |
|---|---|---|---|
| Vendor ID: | 012602 | Check Date: | Jul 12/13 |

| Invoice Num | Invoice Date | Reference | Invoice Amount | Payment Amt | Request Number |
|---|---|---|---|---|---|
| AG0314708 | Jul 12/13 | Filing Fee | 1,850.00 | 1,850.00 | |
| | | Totals: | $1,850.00 | $1,850.00 | 401193 |

**American Arbitration Association**
*Dispute Resolution Services Worldwide*

Please visit our website at www.adr.org if you
would like to file this case online. AAA Case Filing
Services can be reached at 877-495-4185.

**COMMERCIAL ARBITRATION RULES**
**DEMAND FOR ARBITRATION**

*MEDIATION: If you would like the AAA to contact the other parties and attempt to arrange a mediation, please check this box. ☐*
*There is no additional administrative fee for this service.*

| Name of Respondent | Name of Representative (if known) |
|---|---|
| NonInvasive Medical Technologies, Inc. | Unknown |

| Address | Name of Firm (if applicable) |
|---|---|
| 6412 S. Arville Street | |
| | Representative's Address |

| City | State | Zip Code | City | State | Zip Code |
|---|---|---|---|---|---|
| Las Vegas | NV | 89118- | | | |

| Phone No. | Fax No. | Phone No. | Fax No. |
|---|---|---|---|
| (702) 614-3360 | (702) 614-4170 | | |

| Email Address: | Email Address: |
|---|---|
| mccaughan@nmtinc.org | |

The named claimant, a party to an arbitration agreement dated November 18, 2011 , which provides for arbitration under the
Commercial Arbitration Rules of the American Arbitration Association, hereby demands arbitration.

THE NATURE OF THE DISPUTE

Breach of Subcontract No. NMT-IHA Task Order B10-001 by Respondent for failure to pay monies owed ($150,000.00) for services rendered by claimant.

| Dollar Amount of Claim $150,000.00 | Other Relief Sought: ☒ Attorneys Fees   ☒ Interest |
|---|---|
| | ☒ Arbitration Costs ☐ Punitive/ Exemplary ☐ Other _____ |

Amount Enclosed $ 1,850.00 _____ In accordance with Fee Schedule: ☐Flexible Fee Schedule  ☒Standard Fee Schedule

PLEASE DESCRIBE APPROPRIATE QUALIFICATIONS FOR ARBITRATOR(S) TO BE APPOINTED TO HEAR THIS DISPUTE:

contract breach/ payment disputes

Hearing locale Clark County, NV _____   (check one) ☐ Requested by Claimant   ☒ Locale provision included in the contract

| Estimated time needed for hearings overall: | Type of Business: Claimant ___ medical-related services ___ |
|---|---|
| 2.00 ___ hours or _____ days | Respondent medical-related prods./servs. ___ |

Is this a dispute between a business and a consumer? ☐Yes ☒ No Does this dispute arise out of an employment relationship? ☐ Yes ☐ No

If this dispute arises out of an employment relationship, what was/is the employee's annual wage range? Note: This question is required
by California law. ☐Less than $100,000 ☐ $100,000 - $250,000 ☐ Over $250,000

You are hereby notified that a copy of our arbitration agreement and this demand are being filed with the American Arbitration
Association with a request that it commence administration of the arbitration. The AAA will provide notice of your opportunity
to file an answering statement.

| Signature (may be signed by a representative)   Date: | Name of Representative |
|---|---|
| *Katherine S. Nucci*  7/12/2013 | Katherine S. Nucci / M. Loughran Potter |

| Name of Claimant | Name of Firm (if applicable) |
|---|---|
| InoMedic/Innovative Health Applications, LLC | Thompson Coburn LLP |

| Address (to be used in connection with this case) | Representative's Address |
|---|---|
| 2 Eaton Street | 1909 K St., N.W., 6th Floor |

| City | State | Zip Code | City | State | Zip Code |
|---|---|---|---|---|---|
| Hampton | VA | 23669- | Washington | DC | 20006- |

| Phone No. | Fax No. | Phone No. | Fax No. |
|---|---|---|---|
| (757) 722-7575 | (757) 722-2233 | (202) 585-6931 | (202) 508-1016 |

| Email Address: | Email Address: |
|---|---|
| cgross@ihamedical.com | knucci@thompsoncoburn.com; lpotter@thompsoncoburn.com |

To begin proceedings, please send a copy of this Demand and the Arbitration Agreement, along with the filing fee as
provided for in the Rules, to: American Arbitration Association, Case Filing Services, 1101 Laurel Oak Road, Suite 100
Voorhees, NJ 08043. Send the original Demand to the Respondent.

**SUBCONTRACT AGREEMENT**

This Subcontract Agreement (hereinafter referred to as Subcontract) is entered into as of this 18 day of November, 2011 between Noninvasive Medical Technologies, INC., (NMT) with its principal place of business in 6412 S. Arville Street, Las Vegas, NV 89118 (hereinafter referred to as Contractor) and Innovative Health Applications, LLC, with its headquarters located at 2 Eaton Street, Suite 908, Hampton, VA 23669 (hereinafter referred to as, Subcontractor) and contractor upon the following terms and conditions:

## ARTICLE 1. SCOPE OF PROJECT, TASK ORDER REQUESTS AND RELATED MATTERS

1.1     Subcontractor shall conduct investigations/protocols as set forth in initially in Attachment A, Task Order BIO-001.

The terms and conditions of this Subcontract shall apply to any Task Order except as expressly modified therein. The specific requirements for investigations/protocols shall be set forth in Task Order(s) for that Clinical Trial. Each Task Order shall include all referenced schedules, exhibits, deliverables and attachments therein.

Any conflict between the Subcontract and/or associated Task Order and the Protocol; this Subcontract shall supersede in regards to contractual matters and the Protocol shall supersede in regards to medical care and scientific matters.

1.2     Subcontractor agrees to devote its best efforts to perform efficiently the work required hereunder and agrees to perform the Task Order (s) in conformance with the protocol and all applicable laws, rules and regulations relating to the conduct of the Task Order (s), particularly such laws, rules and regulations concerning or promulgated by the Food and Drug Administration.

1.3     Subcontractor shall provide Contractor with written evidence of review and approval of the protocol and the patient consent form by the applicable Subcontractor Review Board prior to the initiation of the Task Order and of the Subcontractor Review Board's continuing review and approval of the Task Order whenever it is reviewed, but at least once per year.

1.4     Subcontractor shall (i) prepare and maintain complete and accurate study documentation in compliance with applicable Federal, state and local laws, rules and regulations; and (ii) for each patient participating in the study, promptly prepare and submit to Contractor all original case report forms and such other reports as required by the protocol following completion or termination of the Task Order, or as otherwise required pursuant to the associated protocol.

1.5     Study documentation (including all case report forms, source documents and all clinical and other information generated as a result of the study) will be promptly and fully disclosed to Contractor by Subcontractor upon request or as set forth in the protocol, and also shall be made available at Subcontractor's site upon request for inspection, copying, review and audit in reasonable times by representatives of Contractor, the Food and Drug Administration or any other regulatory agencies. Subcontractor agrees to promptly advise Contractor of any regulatory inspection

Contractor:            Dr. Marc Ó Gríofa
                       Noninvasive Medical Technologies, Inc.
                       6412 S. Arville Street
                       Las Vegas, NV 89118

Any such communication shall be deemed to have been given when delivered if personally delivered, on the business day after dispatch if sent by air courier, on the third business day following the date of mailing if sent by mail and on the date of telefax if sent by telefax transmission.

## ARTICLE 13. USE OF NAME, LOGO, OR OTHER SYMBOLS

Neither party shall use the name, logo, or other symbols of the other party for any marketing or promotional purposes without prior written consent of the other party.

## ARTICLE 14. ENTIRE SUBCONTRACT

This Subcontract, along with any executed Task Orders, constitutes the entire Subcontract between the parties relating to the clinical study and supersedes all prior negotiations, representations, Subcontracts, and understandings among the parties with respect thereto.

## ARTICLE 15. AMENDMENT, MODIFICATION AND WAIVER

This Subcontract shall not be altered or otherwise amended except pursuant to an instrument in writing signed by each of the parties hereto, except that any party to this Subcontract may waive any obligation owed to it by another party under this Subcontract in writing. The waiver by any party hereto of a breach of any provision of this Subcontract shall not operate or be construed as a waiver of any subsequent breach.

## ARTICLE 16. DISPUTES

Contractor and Subcontractor agree to first enter into negotiations to resolve any controversy, claim or dispute ("dispute") arising under or relating to this Subcontract. The parties agree to negotiate in good faith to reach a mutually agreeable resolution of such dispute within a reasonable period of time. If good faith negotiations are unsuccessful, Contractor and Subcontractor agree to resolve the dispute by binding and final arbitration in accordance with the Commercial Arbitration Rules of the American Arbitration Association then in effect. The arbitration shall take place in the Clark County, State of Nevada. The arbitrator(s) shall be bound to follow the provisions of this Subcontract in resolving the dispute, and may not award punitive damages. The decision of the arbitrator(s) shall be final and binding on the parties, and any award of the arbitrator(s) may be entered or enforced in any court of competent jurisdiction.

IN WITNESS WHEREOF, the parties have caused this Agreement to be duly executed by an appropriate officer as of the day and year written below.


NONINVASIVE MEDICAL TECHNOLOGIES

By:

Name: Dr. Marc Ó Gríofa

Title: CTO/CMO

Date: 11-18-11

INNOVATIVE HEALTH APPLICATIONS

By:

Name: Cynthia L. Gross

Title: President

Date: 11-18-11


READ AND ACKNOWLEDGED BY PRINCIPAL INVESTIGATOR

Name: Kenneth D. Cohen, PhD, CCRP

Title: Principal Investigator

Date: 21 Nov 2011

**EXHIBIT C**

**From:** AAA Rick Zieglowsky
**Sent:** Tuesday, October 15, 2013 2:56 PM
**To:** 'Nucci, Katherine S.'; lpotter@thompsoncoburn.com; dmzack@mcalpinepc.com; mlmcalpine@mcalpinepc.com
**Cc:** jay@maclaw.com; nanichols@mcalpinepc.com
**Subject:** 79 122 84 13 Arbitrator Appointment / Preliminary Hearing

**Attachments:** Notice of Appointment.pdf; Notice of Compensation.pdf

October 15, 2013

Katherine S. Nucci, Esq.
Thompson Coburn, LLP
1909 K Street NW
Suite 600
Washington, DC  20006-1167

M. L. Potter
Thompson Coburn LLP
1909 K Street NW
Suite 600
Washington, DC  20006

David M. Zack
McAlpine PC
3201 University Dr., St. 100
Auburn Hills, MI  48326

Mark McAlpine
McAlpine & McAlpine, P.C.
3201 University Drive #100
Auburn Hills, MI  48326-0000

Re: 79 122 00084 13
    InoMedic/Innovative Health Applications, LLC
    and
    NonInvasive Medical Technologies, Inc.

Dear Counsel:

This will advise the parties that the Association has appointed  Jay Young as arbitrator. Enclosed please find the arbitrator's duly executed Notice of Appointment and Disclosure Letter as well as the Notice of Compensation Arrangements.

As the arbitrator has made no disclosures, **Parties and Arbitrators are requested to provide your availability for a preliminary hearing conference call by utilizing the online calendar via the following link:**

http://www.when2meet.com/?1202186-wJzgD

Jay Young, Esq.
Nevada Bar No. 5562
HOWARD & HOWARD ATTORNEYS, PLLC
Wells Fargo Tower, Suite 1000
3800 Howard Hughes Parkway
Las Vegas, NV 89169
Telephone: (702) 667-4804
Facsimile: (702) 567-1568
Arbitrator

AMERICAN ARBITRATION ASSOCIATION

| | |
|---|---|
| INOMEDIC/INNOVATIVE HEALTH APPLICATIONS, LLC,<br><br>    Claimant,<br><br> v.<br><br>NONINVASIVE MEDICAL TECHNOLOGIES, INC.,<br><br>    Respondent. | Case No. 79-122-00084-13 |

<b>ARBITRATOR'S DECISION REGARDING MOTION FOR SUMMARY DISPOSITION</b>

   Claimant, InoMedic/Innovative Health Applications, LLC (hereinafter "IHA"), submitted Claimant's Motion for Summary Disposition (styled as "Claimant's Motion For Summary Judgment") dated January 21, 2014, along with Claimant's Statement of Material Facts as to Which There is No Genuine Dispute. Respondent Noninvasive Medical Technologies, Inc. (hereinafter "NMT") submitted its Response in Opposition to Claimant's Motion for Summary Disposition dated February 10, 2014, along with its Statement of Contested Facts in Opposition to Claimant's Motion for Summary Disposition. Claimant submitted its Reply Memorandum in Support of its Motion for Summary Judgment dated February 17, 2014. Respondent submitted it's Sur-Reply in Opposition to Claimant's Motion for Summary Disposition dated March 21, 2014, and Claimant submitted its Response to Respondent's Sur-reply In Opposition to

1

Claimant's Motion for Summary Disposition dated March 25, 2014. The Arbitrator having reviewed all of the papers and pleadings on file herein, hereby submits his decision as follows.

## FINDINGS OF UNDISPUTED FACTS

1.      IHA entered into a subcontract agreement, identified as NMT-IHA Task Order BIO-001 ("Subcontract"), with NMT on November 18, 2011. See IHA Document Production Nos. IHA000001-27; NMT Document Production Nos. NMT000004-30.

2.      The scope of work under the Subcontract is described as "research and development effort to determine the uniqueness of human cardiopulmonary signatures, for implementation into a biometric system that will collect, store, and compare the data in order to accurately identify an isolated or remote person." Id. at IHA000014 and NMT000017. The period of performance for the effort was "between November 2011 and March 2013." Id.

3.      The subcontract agreement was awarded to IHA under NMT's prime contract with the Naval Surface Warfare Center – Crane Division (The "Government" or "Navy"), Contract No. N00164-11-C-JS10 ("Prime Contract"). See Respondent's Answers to Claimant's First Set of Discovery Requests ("NMT Discovery Response"), Answers to Request for Admission Nos. 1-4; NMT Document Production Nos. NMT000221-222 (attached to NMT Discovery Response).

4.      NMT has received full payment from NSWC-Crane under the Prime Contract in the total amount $3,800,000.01. NMT Document Production Nos. NMT000208-229 (attached to NMT Discovery Response).

5.      Under the terms of the Subcontract, IHA was required to perform certain services and to provide NMT with reports and other deliverables during the period of performance. IHA Document Production Nos. IHA000014-24; NMT Document Production Nos. NMT000017-27.

6.      The Subcontract was issued as "a fixed price level of effort (FPLOE) Contract with a maximum ceiling of $800,000." IHA Document Production No. IHA000002; NMT Document Production No. NMT000005.

7.      Subcontract Attachment A, Section 9.0, entitled "Billing Schedule," states that "[p]ayment will occur after 30 days once submitted by the Subcontractor and approved by the Contractor/Government," and sets forth a schedule providing for 16 monthly payments to IHA by NMT of $45,000.00 per event, which was the Government's approval of Bi-weekly Monthly Reports.  A final payment in the amount of $80,000.00 was to be paid to IHA (Event 17) upon the Government's approval of a Final Report/Demonstration to occur March 2013.   IHA Document Production Nos. IHA000025-26; NMT Document Production Nos. NMT000028-29.

8.      IHA performed services under the Subcontract, and NMT made payments to IHA in accordance with the Subcontract Billing Schedule, from November 2011 through May 2012. Although IHA continued to perform services through September 2012, NMT failed to pay IHA's invoices dated June 15, 2012, July 13, 2012 and August 9, 2012.  IHA Document Production Nos. IHA000028-35 and IHA000093-96.

9.      NMT cited cash flow problems and changes in the way the U.S. Government paid NMT as the reason for its failure to pay IHA in the amount of $135,000.00 pursuant to the June, July and August 2012 invoices.   IHA Document Production Nos. IHA000031-32 and IHA000037-40; NMT Document Production Nos. NMT000202-204.

10.      On September 12, 2012, IHA communicated with NMT via e-mail in response to an NMT request for additional time to become current on the then outstanding invoices totaling $180,000.00.  In the e-mail, IHA requested that NMT pay the two invoices from June 2012 and July 2012 in the total amount of $90,000 by September 14 to provide IHA with "a measure of

confidence to keep moving forward on the project . . .." IHA Document Production Nos. IHA000091-92.

11.    IHA notified NMT, via a letter dated September 17, 2012 and an e-mail transmitting the letter on September 18, 2012, that IHA would have to stop work on the Subcontract effective October 1, 2012 if the past due invoices were not paid by that date. IHA Document Production Nos. IHA000082 and IHA000085-87.

12.    By letter dated October 2, 2012, IHA notified NMT that IHA had stopped work under the Subcontract "due to NMT's failure to pay the amount currently due to InoMedic of $135,000 for work already performed under the subcontract." IHA advised NMT that IHA could not resume work on the project "until your account is paid in full or alternative arrangements are made." IHA Document Production Nos. IHA000078-80; NMT Document Production Nos. NMT000040-41.

13.    On October 4, 2012, NMT proposed a payment schedule to become current on IHA's past-due invoices, consisting of a progress payment of $50,000 on October 5, an additional progress payment of $100,000 on or before October 12, and a commitment to be current on all IHA invoices prior to the end of 2012. Upon receipt of the first progress payment, IHA would agree to "reengage their part of the contract requirements as outlined in NMT-IHA Task Order BIO-001." IHA Document Production Nos. IHA000041-42; NMT Document Production No. NMT000038.

14.    By letter dated October 5, 2012 to NMT, IHA agreed to resume work provided that NMT make payment to IHA in the amount of $150,000 on or before October 15, 2012. The letter further stated that "NMT is hereby put on notice that it is InoMedic's intent to institute an immediate stop work order under the following circumstances: (1) Failure to pay any invoice

dated October 15, 2012 and thereafter in accordance with our subcontract agreement, and (2) Failure to pay the $75,000 from past due invoices by December 31, 2012." IHA Document Production Nos. IHA000074-75; NMT Document Production Nos. NMT000036-37.

15.     IHA received payments from NMT of $50,000 on October 9, $50,000 on October 10, $50,000 on October 12, and $30,000 on November 26. An additional payment of $30,000 was received by IHA from NMT on December 17, 2012 in partial payment of IHA's October 15, 2012 invoice for services provided in September." IHA Document Production Nos. IHA000060-6175; NMT Document Production Nos. NMT000201 and NMT000205.

16.     By letter dated January 2, 2013, IHA advised NMT that IHA "had reissued a stop-work order, effective immediately," because of NMT's acknowledged failure to cure its breach of the Subcontract as outlined in NMT's October 4, 2012 letter. IHA Document Production No. IHA000071-72.

17.     On February 4, 2013, IHA sent a letter to NMT advising NMT of the impact of IHA's work stoppage on the project's schedule and deliverables caused by NMT's ongoing material breach of the Subcontract. IHA Document Production Nos. IHA000067-68.

18.     IHA again wrote to NMT on March 8, 2013 requesting that NMT take prompt action to make payment to IHA in the amount of $150,000.00, the total outstanding amount owed for services performed by IHA through December 2012. IHA Document Production Nos. IHA000060-61; NMT Document Production Nos. NMT000002-3.

19.     By letter dated April 29, 2013, IHA responded to a NMT e-mail, which requested that IHA provide all of the data that IHA created and collected during the biometrics project, by requesting a telephone conference call to discuss NMT's request and reiterating that IHA had fully discharged its duties under the Subcontract due to NMT's material breach for failure to pay

$150,000 in outstanding invoices.    IHA Document Production Nos. IHA000049-58; NMT Document Production Nos. NMT000169-172.

20.    By letter dated June 14, 2013, IHA made a final request to NMT for payment of the outstanding amounts owed, $150,000, plus $1,356.25 for interest accrued at a rate of 1.75%, "as full and final settlement of your [NMT's] financial obligation to our Company under the above referenced Subcontract." IHA Document Production Nos. IHA000043-44.

21.    All deliverables required *to date* under the Prime Contract were approved and accepted by the Department of Defense as of March 28, 2013.  NMT Document Production Nos. NMT000222-225 (attached to NMT's Discovery Response).

22.    NMT received payments from its Government customer on a monthly basis for amounts invoiced by NMT under the Prime Contract.  NMT has received full and final payment.

23.    At one point IHA stopped work in October of 2012.

24.    After NMT declined to pay IHA's October and November 2012 invoices, IHA, on January 2, 2013, sent NMT a letter stating that IHA "had reissued a stop-work order, effective immediately."

25.    In these proceedings, IHA claims NMT failed to make payment under four invoices, spanning each month from October 2012 – January 2013:

- Inv-0000002120, dated Oct. 15, 2012, for $45,000.00 ($15,000 allegedly owing),
- Inv-0000002159, dated Nov. 15, 2012, for $45,000.00,
- Inv-0000002179, Dec. 14, 2012, for $45,000.00,
- Inv-0000002211, Jan. 15, 2013, for $45,000.00.

26.    By NMT proposing a payment schedule on October 4, 2012 and IHA agreeing to the same by its October 5, 2012 letter, the parties altered their course of dealing by agreement.

27.     The parties' altered their course of dealing and the October 5, 2012 letter provided greater than 30 days notice (pursuant to Section 7.1 of the Subcontract) to NMT that should it fail to pay any invoice dated October 15, 2012 or thereafter, IHA would immediately institute a work stoppage.

## ARGUMENTS PRESENTED

This section discusses the various arguments made by the parties in this matter.

### A. IHA's "Motion for Summary Judgment"

IHA alleges that NMT materially breached the Subcontract by failing to pay monies owed to IHA per the terms of the Subcontract Agreement's (hereinafter the "Agreement") Billing Schedule. IHA further argues that NMT's four affirmative defenses fail, as they are supported by no evidence.

IHA contends that NMT engaged in obfuscatious discovery tactics which failed to improve NMT's legal justification for its affirmative defenses. IHA requests that the Arbitrator therefore strike NMT's affirmative defenses, draw adverse inferences from NMT's conduct, and/or disallow any evidence that NMT may seek to introduce to attempt to support its affirmative defenses. Alternatively, IHA contents NMT's allegedly abusive conduct bolster's IHA's claims and discredits NMT's defense of the matter.

### B. NMT's "Response in Opposition to Claimant's Motion for Summary Disposition."

NMT argues IHA first breached the Agreement between the parties, arguing that IHA improperly stopped work after claiming NMT was later on two invoices; since NMT maintains it was not late on those invoices, IHA's work stoppage was therefore in breach of the Agreement.

NMT claims that even if it was once in breach of the Agreement based on payment of the June-September 2012 invoices, it cured that breach and the only matter at issue is whether NMT is in breach of the October 2012 through January 2013 invoices.

NMT argues there is a genuine issue of material fact as to whether NMT *materially* breached the Agreement. NMT claims IHA has not fully performed the contract because it stopped work on the project before the same was final, including its refusal to produce a Final Report. Further, NMT argues it did not breach the contract by failing to pay two invoices less than 30 days from when IHA submitted them. NMT claims it was under no obligation to pay the same, pursuant to Section 9.0 of Attachment A to the Agreement. NMT argues IHA is only entitled to payment 30 days after the completion of two conditions: 1) NMT approves the invoice; and 2) the Government approves the invoice, rather than merely 30 days after submission of the invoice. NMT argues Section 9.0 acts as a pay-when-paid clause, suspending its need to pay on the invoices until a reasonable time after NMT received payment from the Government.

NMT argues it was not in breach before the work stoppage because the October 15, 2012 invoice and the November 15, 2012 invoice were the only outstanding invoices that were more than 30 days old. While it admits that it did in fact owe ($15,000 from the October 15, 2012 invoice on the date IHA stopped work completely and finally January 2, 2013), NMT argues this breach was not material, that IHA has failed to show that the same was approved by NMT and the Government, or that NMT refused to pay the same before IHA stopped work. NMT also argues that because the contract is silent as to how much time NMT would have to pay IHA after the 30th day, it should have been given a "reasonable" amount of time to pay.

NMT argues that IHA did not provide the requisite 30 days of notice required by Article 7.1 of the Agreement before stopping work. Therefore, NMT argues, IHA breached the Agreement before NMT did. Because IHA allegedly breached the contract, NMT argues that it is entitled to an offset for the cost of completing the project.

NMT finally argues that IHA may not now complain of any alleged discovery abuses by NMT, as IHA did not comply with the Arbitrator's order that the parties must object to any discovery on or before January 17, 2014.

### C. IHA's "Reply Memorandum in Support of its Motion for Summary Judgment"

IHA argues NMT's interpretation of the Agreement is inaccurate. IHA argues that Section 9.0 of Attachment A to the Agreement required invoice payments after 30 days once the Government had approved of the Bi-Weekly/Monthly Reports. Moreover, IHA adds, NMT's own invoicing patter to the Government reflects that NMT would pay on Net 30 terms, not on a pay-when-paid basis. IHA's interpretation is further supported by the Prompt Payment Clause in the Federal Acquisition Regulation, which is incorporated into the Agreement and makes clear that payments are due 30 days after either their receipt or acceptance of the services performed, whichever is later.

IHA argues that at the time it stopped work on January 2, 2013, its October 15, 2012 and November 15, 2012 invoices were well past due under the terms of the Agreement, especially when applying the Prompt Payment Clause. IHA further urges the Arbitrator to consider the course of dealing between the parties when determining whether the breach was material. IHA points out that the amounts of the outstanding invoices, as well as the fact that they have not been paid *to date*, is not in dispute by NMT.

IHA argues materiality is met here, since as of the date of the work stoppage, at least $60,000 was past due, with additional amounts becoming due shortly thereafter. Given NMT's prior payment failures, IHA argues it had to stop work in order to protect itself. IHA further argues that it complied with the 30 day notice before termination provision as well. IHA argues that its letter dated October 5, 2012 put NMT on notice that any future failure to pay would result in an immediate work stoppage.

IHA rejects NMT's argument that it is entitled to a setoff, citing NMT's failure to provide evidence in support of the same, and its failure to respond to discovery consistent with its argument.

### D. NMT's "Sur-Reply in Opposition to Claimant's Motion for Summary Disposition"

NMT argues that IHA's Reply Brief improperly relies upon parol evidence, that it fails to allow for an interpretation of the facts in the light most favorable to NMT, and that the Agreement must be construed against the parties equally, as they are of equal bargaining strength. NMT argues that IHA's only remedy for breach under the Prompt Payment Clause would be interest and not a work stoppage. NMT rejects IHA's reliance on its October 15, 2012 letter, arguing the same only applied to the June through September 2012 invoices. Finally, NMT argues the Agreement does not allow for an award of attorney fees and costs.

### E. IHA's "Response to Respondent's Sur-Reply in Opposition to Claimant's Motion for Summary Disposition"

IHA argues that NMT never suggested when the parties were working together that it couldn't pay until 30 days after the Government approved. It further argues that contemporary invoicing from the parties demonstrate that the payments were made based on approval of the Bi-weekly reports. Further, IHA suggests NMT missed the point regarding the Prompt Payment

Clause argument, which is that the timing mechanism in the clause is consistent with the timing for payment in the Billing Schedule. IHA reiterates the language in the October 15, 2012 letter as being applicable by its clear language to any failure to pay on any future invoice, not just invoices prior to October 2012. Finally, IHA argues that Article 16 of the Agreement does not alter AAA Rule R-47, which it alleges allows an award of attorney fees, interest, and arbitrator fees.

## DECISION

As a preliminary matter, the Arbitrator refuses to strike any matters, draw any negative inferences, or to disallow any evidence due to NMT's alleged discovery abuses, as the same were not properly brought on a motion to compel.

The Arbitrator concludes there are no material issues of fact precluding summary disposition in this matter. Summary disposition of this matter is hereby granted in favor of IHA. NMT was on notice after its earlier breach and cure, that IHA would immediately stop work pursuant to the Agreement if NMT did not pay invoice as per the course of dealing between the parties. NMT accepted the conditions of IHA's October 5, 2012 letter as evidenced by its actions, acting in accordance with the provisions therein. The letter clearly informed NMT that IHA would not tolerate future breaches of the Agreement:

> Although InoMedic is willing to accept a protracted payment schedule for the $75,000 that remains past due, we cannot allow a return to the current situation. Accordingly, NMT is hereby put on notice that it is InoMedic's intent to institute an immediate stop work order under the following circumstances:
>
> 1. Failure to pay **any invoice dated October 15, 2012 and thereafter** in accordance with our subcontract agreement.

IHA000074-75 (emphasis added). NMT was therefore informed well in excess of 30 days required by the Agreement, of IHA's intention to terminate upon further breach.

NMT admits to being past due in its payment of invoices in the minimum amount of $15,000 as of the date of work stoppage-January 2, 2013. In reality, it was at that point delinquent at least $60,000. NMT was in material breach of the Agreement. Moreover, NMT failed to provide proof of its alleged right of setoff, and the same is therefore rejected.

IHA is entitled to its damages in the amount of $150,000, plus interest, and reimbursement of all arbitrator fees and AAA costs in this matter. IHA's request for attorney fees is rejected, as the same is not supported by the Agreement or statute. IHA shall submit a request for all interest, fees, and costs within 10 business days of this decision. NMT shall have 10 days to oppose the same. The Arbitrator will thereafter issue an award.

Dated this 15th day of April, 2014.

HOWARD & HOWARD ATTORNEYS, PLLC

Jay Young, Esq.
Nevada Bar No. 5562
Wells Fargo Tower, Suite 1000
Las Vegas, NV  89169
Arbitrator

12

**EXHIBIT D**

Jay Young, Esq.
Nevada Bar No. 5562
HOWARD & HOWARD ATTORNEYS, PLLC
Wells Fargo Tower, Suite 1000
3800 Howard Hughes Parkway
Las Vegas, NV  89169
Telephone: (702) 667-4804
Facsimile:  (702) 567-1568
Arbitrator

AMERICAN ARBITRATION ASSOCIATION

| | |
|---|---|
| INOMEDIC/INNOVATIVE HEALTH APPLICATIONS, LLC, <br><br>     Claimant, <br>  v. <br><br> NONINVASIVE MEDICAL TECHNOLOGIES, INC., <br><br>     Respondent. | Case No. 79-122-00084-13 |

**AMENDED DECISION AND AWARD**

Claimant, InoMedic/Innovative Health Applications, LLC (hereinafter "IHA"), submitted Claimant's Motion for Summary Disposition (styled as "Claimant's Motion For Summary Judgment") dated January 21, 2014, along with Claimant's Statement of Material Facts as to Which There is No Genuine Dispute.  Respondent Noninvasive Medical Technologies, Inc. (hereinafter "NMT") submitted its Response in Opposition to Claimant's Motion for Summary Disposition dated February 10, 2014, along with its Statement of Contested Facts in Opposition to Claimant's Motion for Summary Disposition.  Claimant submitted its Reply Memorandum in Support of its Motion for Summary Judgment dated February 17, 2014.  Respondent submitted it's Sur-Reply in Opposition to Claimant's Motion for Summary Disposition dated March 21, 2014, and Claimant submitted its Response to Respondent's Sur-reply In Opposition to Claimant's Motion for Summary Disposition dated March 25, 2014.

1

Further, IHA submitted Claimant's Request for Interest, Costs and Expenses on April 28, 2014. NMT submitted Respondent's Response in Opposition to Claimant's Request for Interest, Costs and Expenses on May 12, 2014.

## DECISION

As a preliminary matter, the Arbitrator refuses to strike any matters, draw any negative inferences, or to disallow any evidence due to NMT's alleged discovery abuses, as the same were not properly brought on a motion to compel.

The Arbitrator concludes there are no material issues of fact precluding summary disposition in this matter. Summary disposition of this matter is hereby granted in favor of IHA. NMT was on notice after its earlier breach and cure, that IHA would immediately stop work pursuant to the Agreement if NMT did not pay invoice as per the course of dealing between the parties. NMT accepted the conditions of IHA's October 5, 2012 letter as evidenced by its actions, acting in accordance with the provisions therein. The letter clearly informed NMT that IHA would not tolerate future breaches of the Agreement:

> Although InoMedic is willing to accept a protracted payment schedule for the $75,000 that remains past due, we cannot allow a return to the current situation. Accordingly, NMT is hereby put on notice that it is InoMedic's intent to institute an immediate stop work order under the following circumstances:
>
> 1. Failure to pay **any invoice dated October 15, 2012 and thereafter** in accordance with our subcontract agreement.

IHA000074-75 (emphasis added). NMT was therefore informed well in excess of 30 days required by the Agreement, of IHA's intention to terminate upon further breach.

NMT admits to being past due in its payment of invoices in the minimum amount of $15,000 as of the date of work stoppage-January 2, 2013. In reality, it was at that point delinquent at least $60,000. NMT was in material breach of the Agreement.

Moreover, NMT failed to provide proof of its alleged right of setoff, and the same is therefore rejected.

## AWARD

IHA is hereby awarded its damages in the amount of $150,000, plus interest in the amount of $3,628.06, and fees/costs in the amount of $5,510.00, for a total award of $159,138.06.  IHA's motion for attorney fees and reconsideration thereof is denied.

## FEES

The administrative fees and expenses of the AAA totaling $1,850.00 are to be borne $1,850.00 by Noninvasive Medical Technologies, Inc.  The compensation and expenses of the Arbitrator totaling $7,360.00 are to be borne $7,360.00 by NonInvasive Medical Technologies, Inc.  Therefore, NonInvasive Medical Technologies, Inc. has to pay InoMedic/Innovative Health Applications, LLC, an amount of $5,510.00.

Dated this 2ⁿᵈ day of June, 2014.

HOWARD & HOWARD ATTORNEYS, PLLC

Jay Young, Esq.
Nevada Bar No. 5562
Wells Fargo Tower, Suite 1000
Las Vegas, NV  89169
Arbitrator

# UNITED STATES DISTRICT COURT
## DISTRICT OF NEVADA
## SOUTHERN DIVISION

INOMEDIC/INNOVATIVE HEALTH )
APPLICATIONS, LLC, )
                                  )
           **Petitioner** )
                                  )
**v.** )      Case No. _____
                                  )
NONINVASIVE MEDICAL )
TECHNOLOGIES, INC., )
                                  )
           **Respondent.** )

## MEMORANDUM OF LAW IN SUPPORT OF
## PETITION TO CONFIRM ARBITRATION AWARD

### PRELIMINARY STATEMENT

Petitioner InoMedic/Innovative Health Applications, LLC ("Petitioner" or "IHA")
submits this memorandum of law in support of its Petition to Confirm Arbitration Award.
Arbitrator Jay Young issued his decision granting summary judgment and damages in favor of
IHA on April 15, 2014 after extensive briefing by both parties. The arbitrator's decision carefully
analyzes all of the undisputed facts and arguments presented by both parties. On June 2, 2014,
the Arbitrator issued his final decision awarding damages, interest, and costs to IHA in the total
amount of $159,138.06. The final award decision accurately addressed the relevant facts,
positions presented by the parties, and the applicable law.  Accordingly, this Court should
confirm the final award and enter judgment.

## FACTS

The relevant facts are set forth in the accompanying Petition to Confirm Arbitration Award, and are repeated here only as necessary.

## ANALYSIS

For the following reasons, the arbitrator's final award decision should be confirmed. The Federal Arbitration Act (9 U.S.C. § 1 *et seq.*), provides the guidelines for addressing issues related to arbitrations. The procedure for confirming arbitration awards is as follows: "[if] the parties in their agreement have agreed that a judgment of the court shall be entered upon the award made pursuant to the arbitration, and shall specify the court, then at any time within one year after the award is made any party to the arbitration may apply to the court so specified for an order confirming the award, and thereupon the court must grant such an order unless the award is vacated, modified, or corrected as prescribed in sections 10 and 11 of this title." 9 U.S.C. § 9 (2012).

An arbitration award must be confirmed unless (1) the award was procured by corruption, fraud, or other undue means or (2) if the arbitrator's decision was "completely irrational" exhibiting "a manifest disregard of law." *See* 9 U.S.C. §§ 9-11; *Kyocera Corp. v. Prudential-Bache Trade Services, Inc.*, 341 F.3d 987, 997 (9th Cir. 2003) (internal citations omitted). "Manifest disregard of the law is more than an error in interpretation or application of the law, but rather occurs when it is clear from the record that the arbitrators recognized the applicable law and then ignored it." *See Estate of Wildhaber ex rel. Halbrook v. Life Care Centers of Am., Inc.*, 2:10-CV-00015-MMD, 2012 WL 5287980, at *1 (D. Nev. Oct. 23, 2012). Consequently, a

- 2 -

district court faced with a petition for confirmation "may vacate or revise blatant facial errors" but may not "review the merits of an arbitration decision." *Id.*

The Federal Arbitration Act's limited grounds for vacatur, modification, or correction of an award afford a district court "an extremely limited review" in order to "preserve due process but not permit unnecessary public intrusion into private arbitration procedures." *Kyocera Corp.*, 341 F.3d at 998. "Neither erroneous legal conclusions nor unsubstantiated factual findings justify federal court review of an arbitral award under the statute, which is unambiguous in this regard." *Id.* at 994. The purpose of confirmation is thus to render the arbitrator's award a final judgment so that it may "have the same force and effect, in all respects, as, and be subject to all the provisions of law relating to, a judgment in an action." 9 U.S.C. § 13.

The arbitrator's final award decision dated June 2, 2014 should be confirmed, and final judgment rendered thereon, because the award easily satisfies the statutory outline for confirmation.  First, in Article 16 of the Subcontract Agreement, the parties expressly agreed to arbitration to resolve disputes and that "any award of the arbitrator(s) may be entered or enforced in any court of competent jurisdiction."  Second, the award was not procured by corruption, fraud, or undue means. Third, the award does not manifest a disregard of the law or contain blatant facial errors. Both parties submitted multiple filings, thoroughly briefing all issues and affirmative defenses, for the arbitrator's review and consideration. The arbitrator's decision granting summary judgment in favor of IHA carefully delineates the undisputed facts in the case and also addresses each party's arguments in turn before reaching a decision. The final award evidences a careful consideration and application of the law necessary to grant summary disposition on a simple failure-to-pay dispute.

5984479.2

Based on the arbitrator's thorough review of the issues in this straightforward dispute, this Court should grant IHA's Petition to Confirm Arbitration Award.

## **CONCLUSION**

The Petitioner respectfully requests that this Court confirm the arbitrator's final award dated June 2, 2014 and enter judgment in Petitioner's favor pursuant to the Federal Arbitration Act, 9 U.S.C. § 9, in the amount of $159,138.06 and grant such other and further relief as the Court deems just and proper.

Respectfully submitted,

Thompson Coburn LLP

By  _Katherine D Nucci_

Katherine S. Nucci
D.C. Bar # 358539
1909 K Street, N.W., 6th Floor
Washington, D.C.  20006
Tel:  (202) 585-6931
Fax:  (202) 508-1016

Counsel to InoMedic/Innovative Health
Applications, LLC

Dated:  June 20, 2014

- 4 -

5984479.2

## CERTIFICATE OF SERVICE

      I hereby certify that on this 20th day of June, 2014, I caused the foregoing Memorandum of Law in Support of Petition to Confirm Arbitration Award to be served via first-class mail upon Mark L. McAlpine, Esq., McAlpine PC, 3201 University Drive, Suite 100, Auburn Hills, MI 48326, counsel for Respondent NonInvasive Medical Technologies, Inc.

Katherine S. Nucci

5984479.2

# UNITED STATES DISTRICT COURT
## DISTRICT OF NEVADA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| INOMEDIC/INNOVATIVE HEALTH APPLICATIONS, LLC, | ) ) ) | |
| Petitioner | ) ) | |
| v. | ) ) | Case No. _____ |
| NONINVASIVE MEDICAL TECHNOLOGIES, INC., | ) ) ) ) | |
| Respondent. | ) ) | |

## PETITIONER'S DISCLOSURE STATEMENT

Pursuant to the Court's Local Rule 7.1-1, the undersigned, counsel of record for

Petitioner InoMedic/Innovative Health Applications, LLC, certifies that there are no known

interested parties other than those participating in this case. This representations are made to

enable judges of the Court to evaluate possible disqualifications or recusal.

Respectfully submitted,

Thompson Coburn LLP

By _____

Katherine S. Nucci
D.C. Bar # 358539
1909 K Street, N.W., 6th Floor
Washington, D.C. 20006
Tel: (202) 585-6931
Fax: (202) 508-1016

Counsel to InoMedic/Innovative Health
Applications, LLC

Dated: June 20, 2014

## CERTIFICATE OF SERVICE

I hereby certify that on this 20th day of June, 2014, I caused the foregoing Petitioner's Disclosure Statement to be served via first-class mail upon Mark L. McAlpine, Esq., McAlpine PC, 3201 University Drive, Suite 100, Auburn Hills, MI 48326, counsel for Respondent NonInvasive Medical Technologies, Inc.

Katherine S. Nucci